E. N. TUTTLE *et al.*, v. JENNIE RAISH *et al.*, Appellants, MARGERY WARDWELL (formerly TUTTLE), Intervener, Appellant.

**Deed Held Attempt to Make Will.** Evidence considered and held
1 to show that an instrument executed by a decedent was not a deed, but was testamentary in character, and therefore void
2 for want of compliance with the law relating to wills.

**Presumption of Marriage:** FAILURE TO FILE DIVORCE RECORD. Shortly after a forced marriage, the husband left his wife in New York, and came west, where he remarried, and lived with a second wife until his death. His first wife also remarried,

but claimed that she had not been divorced from her first husband. The court records in the counties where the husband lived after leaving his first wife until his remarriage failed to show that he had obtained a divorce. He resided in Chicago for some time before the great fire, in which all the court records were destroyed. The first wife claimed not to have received by mail any summons in a divorce suit, as required by the law of Illinois, but she changed her residence shortly after he left her, and he might have been ignorant of her new residence. The husband while living in Chicago and before his remarried, declared that he had been married and was divorced. *Held*, that the evidence, together with the strong presumption in favor of the legality of marriages, warranted a holding that the second marriage was valid.

*Appeal from Plymouth District Court.*—HON. F. R. GAYNOR, Judge.

FRIDAY, APRIL 11, 1902.

THIS is an action in equity for the partition of certain real estate left by one Milo R. Tuttle, who died intestate and without issue. Plaintiffs are brothers and sisters of decedent. Jennie Raish was married to Milo R. Tuttle, and on his death was apparently his widow. She has since married one Raish. She claims, however, more than a widow's share of the estate, for she sets up a written instrument which she avers to be a conveyance made by Tuttle to her of the whole of his property. Acting upon her alleged rights under this instrument, she has, since her husband's death, made sales and conveyances of real estate to different persons, who are made defendants herein. Margery Wardwell claims to have been married to Milo R. Tuttle many years before he contracted an alliance with the present Jennie Raish. She avers they were never divorced, and by petition of intervention she makes claim to a widow's share, viz, one-half of the property. The trial court found against the validity of the alleged conveyance to defendant Jennie Raish, but it confirmed her right to a widow's share, and held the purchasers from her respectively entitled to an undivided one-half of

the property so conveyed by her to each. . The defendants and intervener appeal.—*Affirmed.*

*Zink & Roseberry* and *Geo. W. Argo* for defendants, appellants.

*M. J. Sweeley* for appellees and for intervener appellant.

WATERMAN, J.—Naturally, the first question for our consideration is as to the effect of the written instrument through which Jennie Raish claims to have obtained title to all of this property. We set it out in full:

"Whereas, my wife, Jennie Tuttle, has been equally instrumental in the accumulation of our property with myself, and from time to time assisting me with money of her own individually, therefore, in the event of my death without children, after all our just debts and my funeral expenses are paid, and one hundred and fifty dollars for a monument at my mother's grave, I, Milo R. Tuttle, of Clinton, Iowa, do hereby make and constitute my wife, Jennie Tuttle, the sole owner in her own right (without regard to my next of kin) of all our property, whether real or personal, or wherever situated, that we may be possessed of, and I hereby invest her with full powers and rights to receive, receipt for, sell, dispose of, and give title to as valid as if done by both of us in my lifetime. Witness my hand and seal this March 1st, 1884, at Clinton, Iowa. . Milo R. Tuttle. (L. S.) Geo. Haywood, Witness.

"State of Iowa, Clinton County—ss.: On the 1st day of March, 1884, by request of Milo R. Tuttle, I witnessed the execution of the within instrument, and he acknowledged it to be his free act and done for the purposes therein expressed. Witness my hand and notarial seal day and year last written. [Seal.] George Haywood, Notary Public."

On the tenth day of December, 1896, George Haywood, notary public, made an amended acknowledgment, or certifi-

cate of acknowledgment, of said instrument of conveyance, being in words and figures as follows, to wit:

"State of Iowa, Clinton county—ss.: To Whom This may Come: Be it known that I, George Haywood, notary public in and for Clinton county, Iowa, certify that Milo R. Tuttle, to me well known, did on the 1st day of March, 1884, request me to make a full conveyance in writing of his wish and desire, and ordered that for and in consideration that his wife, Jennie Tuttle, by her own exertions had accumulated the most of what they possessed, he in justice (having no children) assigned, transferred, and set over and conveyed to his wife, Jennie Tuttle, all his rights, titles, and ownership of and in and to all property, both real and personal, that they owned or should thereafter acquire, or wherever situated, she, Jennie Tuttle, to have and to hold in her own individual right without hindrance of any next kin all of which I done by his request in both his and his wife's presence, and without her expressing a wish for him to do; and I witnessed his subscribing thereto, also took his acknowledgment as a notary public of its being his full, free and voluntary act and deed; and furthermore, he, the same identical Milo R. Tuttle, did on or about the 15th day of April, 1896 (after a lapse of twelve years), call and to see me at Clinton, Iowa, and spoke to me of his financial situation, and said that whatever they had was mostly made by his wife's hard work, economy, and that it was justly and rightfully hers, and that he was glad that everything had been made over to her so that she held the full right to all that he possessed. Witness my hand, George Haywood, still being a notary public this December 10th, 1896, Clinton, Iowa."

The material matter for us to decide is whether this instrument is a deed or a will. If it is the latter, it is manifestly of no validity, for it is not executed in the form prescribed by statute. Is it a deed? If it operated to convey a present interest, although possession and enjoyment were re-

served during life by the grantor, it would be effective as a conveyance. *Burlington University v. Barrett,* 22 Iowa, 60; *Craven v. Winter,* 38 Iowa, 471; *Lippold v. Lippold,* 112 Iowa, 134. If it passed no present interest, but was to be operative only upon the grantor's death, then it is testamentary in character, and of no effect unless executed with all the formalities of a will. *Leaver v. Gauss,* 62 Iowa, 314. In *Bigley v. Souvey,* 45 Mich. 370 (8 N. W. Rep. 98), the instrument before the court for construction contained this provision: "The land herein named shall be and continue the property of the first party during his lifetime, and the remainder to said second party immediately at the death of said first party; but, in the event of the death of the second party before the said first party, then the estate herein shall go to said first party. * * *" It was held that title did not pass, the court saying, "The instrument given by defendant was a deed in form, but was testamentary in its nature, and passed no title whatever." In *Crocker v. Smith,* 94 Ala. 295 (10 South. Rep. 258, 16 L. R. A. 576), an instrument quite similar in terms to the one before us was construed by the court. It was properly executed to be either a deed or a will. It was held to be a will, the court saying: "Though an instrument may be in form a deed of gift and designated as such, it is a will if its purpose be testamentary, and it cannot operate during life, but is only consummated by death." But without going into detail as to the language of the cases it is enough to say that the general rule, as we have stated it, has support in the weight of authorities. *Barnes v. Stephens,* 107 Ga. 436 (33 S. E. Rep. 399); *Pinkham v. Pinkham,* 55 Neb. 729 (76 N. W. Rep. 411); *Turner v. Scott,* 51 Pa. 126; *Hazleton v. Reed,* 46 Kan. 73 (26 Pac. Rep. 450, 26 Am. St. Rep. 86); *Conrad v. Douglas,* 59 Minn. 498 (61 N. W. Rep. 673); *Roth v. Michalis,* 125 Ill. 325 (17 N. E. Rep. 809). Devlin, Deeds, section 309. The cases cited by appellants do not antagonize the general doctrine stated. In some of them extrinsic facts were re-

sorted to for interpreting the language of the instrument, and
in all of them it was found that a present interest passed. It
may well be that the instrument should be given some effect
if consistent with well-established legal principles; but a
man may intend to dispose of his property by will, and this
intention be effectually frustrated by his failure to observe
certain required formalities in the execution of the instru-
ment. Some criticism is made upon *Leaver v. Gauss, supra,*
as an authority in the present case, because Leaver, the
grantor, brought the action to set aside his own deed. It is
thought, if he had died before any question was raised as to
the effect of the instrument, the conclusion reached would
have been different. But we can see no reason for this be-
lief. If the instrument was valid and passed an estate, either
present or prospective, it was secure against attack from the
moment of its execution and delivery, for it was made upon
a valuable consideration. The holding of this court rested,
and only could rest, on the theory clearly stated in the opin-
ion,—that no present interest passed, and the instrument was
not in form to create a transfer after the death of the grantor.
It will be seen, then, that the test is, did the grantor intend
to pass a present interest in the property? This intent is
usually to be gathered from the terms of the instrument, and
always so where the provisions are plain and clear, but ex-
trinsic evidence may be received to enable the court to place
itself in the position of the contracting parties in order to
construe doubtful or ambiguous language. Evidence was
offered by defendants to show the intention of Tuttle when
he executed the instrument; but it gives them no aid, for it
consists of statements made by the grantor mostly after the
execution of the paper, and all of which are most consistent
with the thought that he intended the instrument as a post-
humous disposition of his estate. To one neighbor he said
"all he had left he intended should go to Jennie" (his wife).
To another that, "if he should step out, his wife, Jennie,
would have his property." Another witness tells of this

statement made by Tuttle: "He said that he had everything fixed so that Jennie, his wife, would come into possession of all his property; that he intended her to have it all." The wife, who testified without objection, says her husband stated to the scrivener who drew this instrument that she (the wife) had advanced him money, and he then said: " 'If anything can be drawn to make her safe, I want it done,' and that is the way it happened that the instrument was made. It was always Mr. Tuttle's intention that I should have all of the property if anything should happen to him. * * * It was the expressed wish of Mr. Tuttle that the instrument should be drawn to give me this property at the time of his death." The certificate of the notary of December 10, 1896, can be allowed no weight. It was made after Tuttle's death, and is nothing that was required of him officially. It further appears that Tuttle retained possession and control of all his property down to the date of his death. Turning now to the instrument, it will be noted that the interest given was to vest in the event of his death without children, and after payment of debts, funeral expenses and for the erection of a monument to his mother. In the light of the facts stated no very careful analysis of the terms of this writing is needed to show that the intent to provide for the wife and "make her safe" was sought to be effected through an instrument which was to go into effect only upon the decease of the grantor, and that during his life she took nothing. The district court was right in holding that defendant Jennie Raish took no interest under it.

II.   The disposition made of the issue we have just been considering renders it necessary that we determine which of the two claimants has a widow's right in the estate.

It is established that Tuttle married Margery McDougal, the intervener, in Potsdam, N. Y., in the year 1861. It seems to have been a forced marriage. He lived with her, if at all, but a short time, and some two

years after their marriage left her and came West. Two or
three years after he left for the West, intervener married
Wardwell, her present husband, and has lived with him since.
Tuttle married Jennie Bohner (now Jennie Raish) in the
city of Chicago, in the year 1876, and from that time to the
day of his death lived with her openly as his wife.    Inter-
vener claims that she and Tuttle were never divorced.    The
public assertion of this fact must have been somewhat em-
barassing to her, to say the least, for she has a number of
children born of her last marriage.    It is to be said in her
favor, however, that she did not make an appearance in the
case until she was sought out and persuaded to do so by some
of the plaintiffs.    It is shown that Tuttle and intervener
never met after he left her in New York, and she knew noth-
ing of his whereabouts until after his death.    It is admitted
there is no record of Tuttle's divorce in any of the counties
in which he is known to have lived since his marriage to in-
tervener.    In Cook county, Ill., however, the records were
destroyed in Chicago's great fire, and the fact of a divorce
there is sought to be negatived by the showing that the law
of Illinois required that a copy of the summons, where it was
served by publication, be sent by mail to the defendant, and
intervener testifies that she never received any such docu-
ment.    But the weight of this fact is wholly destroyed by
evidence showing that, immediately after Tuttle left her, in-
tervener changed her residence, and, so far as appears, with-
out his knowledge, to Winooski, Vt., where she still resides.
There is a strong presumption in favor of the legality of
every marriage.    Bishop, Marriage and Divorce, section 457.
To support such legality, a presumption of previous divorce
will sometimes be indulged in.    While the act of one party
to the first marriage will not be enough to warrant a pre-
sumption of divorce (*Ellis v. Ellis,* 58 Iowa, 720; *Gilman v.
Sheets,* 78 Iowa, 499; *Barnes v. Barnes,* 90 Iowa, 282; *Good-
win v. Goodwin,* 113 Iowa, 318); the acts of both parties,
when wholly inconsistent with the continuance of marriage

bonds between them, will raise such a presumption (*Blanchard v. Lambert*, 43 Iowa, 228; *Leach v. Hall*, 95 Iowa, 611, and cases therein cited). In addition to the facts we have enumerated it is in evidence without objection that Tuttle, while living in Chicago, and before he married the second time, stated to a disinterested witness that he had been married and was divorced. Altogether we think the facts justify the presumption of a legal annulment of the first marriage, and this authorizes the holding that the second marriage was valid, and that Jennie Raish is the lawful widow of decedent.

III. The decree of the trial court expressly reserved to Jennie Raish any claim she might have against the estate of her deceased husband for money loaned him.

Our conclusion on the whole case is that the decree entered is in all respects correct, and it is AFFIRMED.