Shepard v. Carter.

---

CARRIE SHEPARD, *Appellee*, v. HENDERSON CARTER *et al.* (BELLE OVERTON, *whose real name is Belle Carter, Appellant;* HATTIE CARTER, *Appellee*).

No. 17,317.

SYLLABUS BY THE COURT.

MARRIAGE—*Separation—Divorce—Presumptions.* Appellant and intestate were married but never lived together. The intestate left the state declaring he would obtain a divorce, and returned two years later saying one had been obtained. Appellant, acting on the belief that a divorce had been granted, married another, and children were born of this marriage.

Later, intestate obtained a license and formally married another and lived with her about eighteen years and until his death, and eight children were born of that marriage. When he died, appellant, in a partition proceeding, claimed that no divorce had been granted, and no record or documentary proof of the divorce was introduced. Under the facts of the case it is held that it will be presumed that the first marriage was dissolved by a divorce, and that when appellant claimed to inherit land as the surviving widow of intestate it devolved on her to prove that no divorce had been granted.

Appeal from Leavenworth district court. Opinion filed December 9, 1911. Affirmed.

*R. B. McWilliams, John Clark,* and *M. A. Gorrill,* for the appellant.

*Lee Bond,* and *Malcolm N. McNaughton,* for appellee Hattie Carter.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action in partition brought by Carrie Shepard, in which Henderson Carter and other claimants were named as defendants. Subsequently, in an amended petition, Belle Overton was brought in as a defendant and as one claiming an interest in the land sought to be partitioned. She alleged that she was the wife of Thomas L. Carter, known as Lewis Carter, at the time of his death, and therefore she claimed a share of the property which he had inherited from his father and mother. At the trial it was shown that on January 10, 1880, Belle Overton was married to Lewis Carter by the probate judge. They parted at the courthouse door and never lived together, but she gave birth to a child a few weeks after the ceremony. Shortly afterwards Lewis Carter went west, supposedly to California, and after two years' absence he returned to his former home in Kansas. He told Belle Overton he was going to obtain a divorce, and when he returned he told her that a divorce had been procured. Acting on this information and belief, Belle

Shepard v. Carter.

Overton married Edward Overton, of Lawrence, and two children were born of this marriage. After the marriage of Belle Overton, and on November 25, 1889, Lewis Carter, her former husband, married Hattie Shepard, and they lived together as husband and wife until his death in 1908, and of that union eight children were born, whose ages ranged from two to sixteen years at the time of his death.

Before his marriage to Hattie Shepard, Carter informed her that he had been divorced from Belle Overton, and she saw a document which was called his divorce paper. He made the statement to others, and repeated it to her mother in the probate judge's office where they were married. No record or documentary evidence of the divorce was introduced to prove that a divorce was granted, but all the parties concerned, including his first and second wives, proceeded on the theory that there was a valid divorce for a period of about twenty-five years. While the appellee was unable to, or at least did not, produce record proof of the divorce, yet from the facts stated the presumption arises that the second marriage, so long recognized by the parties as legal, is valid, and it devolves on Belle Overton, who attacks the validity of the marriage, to prove that it is illegal; that is, that a divorce from her had not been granted. As a basis for this presumption there is the license and authority granted by the probate judge for the second marriage, the formal entry into the marriage relation consummated by cohabitation, the maintenance of the relation for eighteen years and until the death of Lewis Carter and the birth of eight children, the declaration by him to his first wife that a divorce would be procured, and, afterwards, that one had been procured, the recognition of the existence of a divorce by the first wife when she married again, and the status of the children born of her second marriage. Now, when a marriage has been entered into in apparent good faith, as here, and children have been

born of it, courts go to the limit in upholding the validity of the union and the legitimacy of the children. In section 457 of volume 1 of the sixth edition of Bishop on Marriage and Divorce it is said:

"When a marriage, therefore, has once been shown, however celebrated, whether regularly or irregularly, or however proved, whether directly or by circumstantial evidence, the law raises a strong presumption in favor of its legality; so that the burden is with the party objecting, throughout, and in every particular, to prove, against the constant pressure of this presumption of law, that it is illegal and void."

Every intendment of the law is in favor of matrimony, and wherever there is room for a presumption it always operates in favor of validity. This is especially true where the status of children is involved, and as stated in *Hynes et al. v. McDermott et al.,* 91 N. Y. 451, "the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy." (p. 459.) So when it appears that a person who was married before is living in wedlock, the presumption operates in favor of the second marriage, it being presumed that the first marriage has been dissolved by death or divorce; and it has been held that if it appears that a man has been married three times, the presumption is in favor of the third rather than the second marriage. (*Palmer v. Palmer,* 162 N. Y. 130, 56 N. E. 501.)

In a case in Iowa, where there was a forced marriage, the husband left his wife, going to a distant place, and after a time was married again, and lived with that wife until he died. The first wife also married again and a number of children were born of that marriage. When her first husband died she set up the claim that there had been no divorce and that she was his surviving widow and entitled to a share in his estate. There was no record of a divorce in any of the places where he had lived, but in view of the acts of both parties it

was held that the presumption of a divorce should be indulged.  It was said:

"The acts of both parties, when wholly inconsistent with continuance of marriage bonds between them, will raise such a presumption. . . . In addition to the facts we have enumerated, it is in evidence without objection that Tuttle, while living in Chicago, and before he married the second time, stated to a disinterested witness that he had been married and was divorced.  Altogether we think the facts justify the presumption of a legal annulment of the first marriage."  (*Tuttle v. Raish,* 116 Iowa, 331, 338, 339, 90 N. W. 66.)

In *Hadley v. Rash,* 21 Mont. 170, 53 Pac. 312, the plaintiff and Rash intermarried, and six years later they separated, and some years afterwards she married another.  Rash also married again and lived with that wife until he died.  Plaintiff, although married again, insisted that there had been no divorce and that she was the legal surviving widow of Rash, but the court held that the burden of proving the absence of a divorce from Rash rested on plaintiff.  It was said:

"It was incumbent upon her to show this fact, notwithstanding it required her to prove a negative.  It was no more difficult for her to prove that there had been no such divorce than it would have been for respondent to prove there had been a divorce granted to Rash.  The appellant, when she married Hadley, certainly acted upon the presumption that Rash was either dead or had obtained a divorce from her.  Why, then, might not the respondent, with propriety, and lawfully, presume, thirty years after Rash had separated from appellant, that there was no legal impediment in the way of her marriage in good faith with him?

"We are unable to discover a circumstance in this case that does not move us strongly to indulge the legal presumption of the validity of the marriage between the respondent and Rash.  We are impelled to such conclusion in the interest of morality, innocence, and the sanctity of the marriage relation.  We are given no good reason why we should depart in this case from

what seems to us to be a well-settled and just rule of legal presumption simply to gratify the cupidity of the claimant, that hesitates at no consideration of morality or innocence, or even the preservation of her own good name and honor, in her reckless struggle for gain." (p. 175.)

Other authorities sustaining this view are: *Nixon v. Wichita Land and Cattle Co.,* 84 Tex. 408, 19 S. W. 560; *Harris v. Harris,* 8 Ill. App. 57; *Greensborough v. Underhill,* 12 Vt. 604; *Teter v. Teter,* 101 Ind. 129; *Boulden et al. v. McIntire,* 119 Ind. 574, 21 N. E. 445; *Goldwater v. Burnside,* 22 Wash. 215, 60 Pac. 409; 26 Cyc. 880; 19 A. & E. Encycl. of L. 1202; 1 Bishop, Mar. & Div., 6th ed., § 457.

In the case of *Renfrow v. Renfrow,* 60 Kan. 277, 56 Pac. 534, which was cited by appellant, the existence of a divorce was not in question, and no consideration was given to the presumption of the validity of a subsequent marriage or to the proof necessary to overcome it.

Appellant contends that, as the first marriage was proven, the presumption, in the absence of evidence of death or divorce, is that such matrimonial relation continued. The authorities cited show that where the circumstances are such as appear in this case the presumption mentioned is outweighed by the stronger presumption of innocence and morality and of the validity of a second marriage solemnized according to law. The presumption of the continuance of a status shown to have existed may, of course, be overcome by slight evidence, but when a second marriage has been entered into in good faith and all parties have acted on the assumption that the first is no longer in force, the natural inference and the prevailing presumption is that no legal impediment existed to entering into the new matrimonial relation. The other presumption referred to must yield to this presumption, said to be one of the strongest known to the law, and those who seek to impeach the second marriage take upon themselves

Lumber Co. v. Lumber Co.

the burden of showing that the first has not been dissolved. (*Boulden et al. v. McIntire*, 119 Ind. 574, 21 N. E. 445.)

This view was taken by the trial court, and its judgment is sustained.