[No. 2242]

## CONSTANCE E. PARKER, RESPONDENT, v. RICK DE BERNARDI, APPELLANT.

[164 Pac. 645]

1. MARRIAGE—COMMON-LAW MARRIAGE.
   As the common law prevails in Nevada with reference to the marriage relation, that relation may be formed by words of present assent, and without the interposition of any person lawfully authorized to solemnize marriage, or to join persons in marriage.

2. TRIAL—COMMON-LAW MARRIAGE—INSTRUCTION.
   In an action for restitution of real property, in which the defendant alleged that he was the plaintiff's husband and that the property was community property, an instruction that, as the relationship existing between the parties in another state prior to their taking up their abode in Nevada was illicit and meretricious, that relationship must be by the jury presumed to continue illicit and meretricious throughout all the time plaintiff and defendant continued to live together, unless by a preponderance of proof a valid marriage contract was actually made and actually entered into between the parties within Nevada, was erroneous, as taking all force and effect from evidence in the case tending to establish a marital relation between the parties during their residence in Nevada.

3. MARRIAGE—COMMON-LAW MARRIAGE—PRESUMPTIONS AND BURDEN OF PROOF.
   Where cohabitation between man and woman was illicit in the beginning, though burden of proof is upon those asserting a valid marriage, there is no presumption that the relationship continued to be illicit, it being a matter of proof, and not of presumption, and a valid marriage under the common law may be shown by proof that the parties sustained toward each other the relation of husband and wife after the impediment to their marriage had been removed; the only presumption to be indulged in being in favor of a valid marriage, which may be based on continuous cohabitation alone.

4. MARRIAGE—COMMON-LAW MARRIAGE—QUESTION FOR JURY.
   While prostitution or immorality might militate against the presumption of a legitimate common-law marriage, such facts are for the jury to consider under proper instructions, since, even though the woman were a prostitute, if a marriage of the highest and most sacramental order had been performed between the parties, it would have had no more binding effect than a common-law marriage *per verba de præsenti*, actually consummated.

APPEAL from Second Judicial District Court, Washoe County; *Thomas F. Moran*, Judge.

Action by Constance E. Parker against Rick De Bernardi.

From a judgment for plaintiff, and an order denying a motion for a new trial, defendant appeals. **Reversed,** with instructions to grant a new trial.

*James T. Boyd* and *Roy W. Stoddard,* for Appellant:

Foreign laws, or laws of sister states, must be proven like any other independent fact, and it was for the jury to find from the evidence offered, what was the law of California; but the lower court, by its instruction, took from the jury this power, and instructed them as to this matter of fact. (*Cavender* v. *Guild,* 4 Cal. 250; Sutherland, Code P. & P., vol. 1, p. 706.)

In view of her admission that she had taken $500 of appellant's money, and then failed to comply with her agreement to deposit the deed in escrow, respondent cannot claim that she is the owner of the entire property. "A binding contract for the sale of land, enforceable in equity, although in fact unexecuted, is considered as performed and the land is in equity the property of the purchaser; and upon payment of the full purchase price the purchaser becomes the owner of a complete equitable estate, and the vendor is a mere trustee for the purchaser, and if the purchaser has paid only a part of the purchase price, the vendor is a trustee to the amount paid." (39 Cyc. 1577; *Taylor* v. *Holmes,* 14 Fed. 498.)

*M. B. Moore,* for Respondent:

Certain codifications of the laws of the State of California, as published under state authority, were identified by a witness whose qualifications were admitted by appellant. This manner of proving the law of a sister state is a common practice, and is sanctioned by the courts of most states having no statutory provision upon the subject. (Jones on Evidence, sec. 515.) It was no error for the court to instruct the jury upon this subject as a matter of fact. (38 Cyc. 1667; *Menzies* v. *Kennedy,* 9 Nev. 152.)

Living together as man and wife does not constitute marriage. (*Letters* v. *Cady,* 10 Cal. 533.) It may have

all the outward appearance of marriage, and still fall far short of marriage. "Marriage is considered in every country as a contract, and may be defined to be a contract according to the form prescribed by the law by which a man and woman capable of entering into such a contract mutually engage with each other to live their whole lives together in the state of union which ought to exist between husband and wife." (Shelford on Marriage and Divorce, 1.) "By cohabitation is not meant simply the gratification of the sexual passions, but to live and dwell together, to have the same habitation, so that where one lives and dwells there does the other live and dwell also." (*O'Malley* v. *O'Malley*, 129 Pac. 501.)

By the Court, McCarran, C. J.:

Some time during the year 1899 the appellant, Rick De Bernardi, and respondent, who in this action styles herself "Constance E. Parker," took up life together in the city of San Francisco, State of California. Respondent was at that time, according to the record, the wife of one Parker. She was then conducting a place of business in the city of San Francisco. Appellant testifies that it was a rooming-house; respondent unblushingly declares it was a house of prostitution. Some time during the year 1900 respondent here secured a decree of divorce from her former husband, Parker. Following this, appellant contends and testifies that they agreed to live as man and wife. The agreement in this respect, if such there were, was after the granting of the interlocutory decree of divorce by the California court, and before respondent had secured her final decree from that tribunal.

In June, 1904, respondent came to Reno, Nevada, and, as far as we are able to learn from the record, immediately entered into the business of conducting a house of prostitution in the restricted district of that city under the name of "Hazel Ward." In the year 1906 appellant disposed of his business in San Francisco and came to Reno, Nevada; and, from all that we can learn, the relationship that had theretofore existed between appellant and

respondent continued. Some time during the year 1906 appellant purchased, in his own name, a tract of land west of the city of Reno, and within the year following constructed on this tract a house which has since borne the name of "Rick's Resort" or "Rick's Roadhouse." In the construction and furnishing of this house many thousands of dollars appear to have been expended. During the year 1908 appellant made a deed conveying the premises to Constance E. Parker.

This action was commenced in the lower court by respondent, under the name of Constance E. Parker, for the restitution of the premises and for damages for rental and the profits thereof.

Appellant here, defendant in the court below, by way of answer and defense, alleged that the parties were husband and wife, and that the plaintiff's name was Constance De Bernardi; that the deed from appellant to respondent was without consideration, and that the property in question was community property.

A verdict being rendered in favor of plaintiff and an order denying a new trial being entered, appeal is taken from the judgment and order.

Many assignments of error are submitted to this court for consideration; but, in view of the issues presented, we shall confine ourselves to the alleged error of the trial court in giving certain instructions to the jury. The instructions complained of read:

"The court instructs the jury that marriage may be implied or inferred from cohabitation when the cohabitation is not illicit in its origin; general reputation among the acquaintances of the parties; their treatment of each other, their speaking of and addressing each other as husband and wife; acts, sayings and conduct which have a natural tendency to show the existence of the marriage relation.

"You are instructed that cohabitation illicit in its origin is presumed to be of that character unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of an

actual contract of marriage. Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual consent.

"You are further instructed that if you find from the evidence that the plaintiff had another husband living at the time the plaintiff and defendant commenced to cohabit and occupy the same room in the city of San Francisco, and that the relation of the plaintiff and defendant continued without any change in the condition or cohabitation of the parties, and that their declarations as to their being married and being husband and wife referred to their cohabitation in San Francisco and at a time when they could not lawfully marry, and not to any marriage con-- tracted after the plaintiff's divorce from her former husband, Parker, then you should find that there was no marriage between plaintiff and defendant.

"You are further instructed that unless you find that the marriage was in fact entered into and consummated between the plaintiff and the defendant in conformity with the provisions of the laws of the State of California, as hereinbefore defined, and proved in this case that the marriage testified to have existed between the plaintiff and defendant in the State of California, does not constitute a valid marriage and that no obligations can be held to exist between the plaintiff and defendant from such relations in that state, and that such relations were in fact illicit and meretricious and are presumed by law to have continued to be so illicit and meretricious throughout all the time plaintiff and defendant continued their relations to each other, unless the proof shows by a preponderance thereof and to your satisfaction that a valid marriage contract was made and entered into between the plaintiff and defendant in the State of Nevada."

1. We dwell especially upon what we deem to be the error in the last paragraph of the instructions quoted. In the first place, under the law of this state as it has been construed by this court it is not necessary, in order

to constitute a valid marriage, that any ceremony should be performed by any person or any ceremony had before any person. This court, in the case of *State* v. *Zichfeld*, 23 Nev. 304, set this question at rest and held that as the common law prevails in this state with reference to the marriage relation, that relation may be formed by words of present assent and without the interposition of any person lawfully authorized to solemnize marriage or to join persons in marriage.

It must be borne in mind that the defense interposed by appellant here in the court below was the marriage relation existing between himself and plaintiff, and his right to possession of the premises in question was based primarily upon the fact as alleged that the property was the result of the joint efforts of the parties. The court by this last instruction told the jury in effect that inasmuch as the relationship existing between the parties in the State of California prior to their taking up their abode in this state was illicit and meretricious, that relationship must be by the jury presumed to continue illicit and meretricious throughout all the time plaintiff and defendant continued to live together, unless by a preponderance of proof a valid marriage contract was actually made and actually entered into between the parties within this state. The force and effect of the language of the trial court, broad and sweeping as it is, was probably lost sight of by the court itself, otherwise it would not have been couched in such language. The illicit and meretricious nature of the relationship of the parties in the State of California must under this instruction be presumed by the jury to continue unless the proof established a valid marriage contract made and entered into between the plaintiff and the defendant *in the State of Nevada.* Indeed, if this instruction were given its full force and effect—and the jury is presumed to give full force and effect to every instruction of law—a marriage ceremony performed between these parties in the most sacred tabernacle, by the highest prelate of some constituted church, under license issued in conformity to

statute, would be unavailing, if perchance that ceremony were performed in a state other than Nevada. Undoubtedly this was not the intention of the trial court, but the instruction was given to the jury, and we have no right to say that the jury looked upon it in any other sense than that conveyed by the specific language employed.

**2.** The instruction given by the trial court in this instance to our mind swept away the force and effect of all the evidence in this case going to establish a marital relation existing between the parties. But it did more than that. It struck down that principle of law of which the jury should have been advised by proper instruction, and which principle seems to have been deep-seated in the minds of all writers and jurists when dealing with matrimonial relations from very early times in the law's making. "*Semper præsumitur pro matrimonio*" was expressive of a doctrine in the early writings of the common law. Indeed, this expression we find made use of in all the ancient discussions bearing upon marriage relation to such an extent that it gained the dignity of being termed a maxim. "Every intendment of the law leans to matrimony," says Mr. Bishop in his work on Marriage and Divorce. Continuing, the learned author observes:

"When a marriage has been shown in evidence, whether regular or irregular, and whatever the form or the proofs, the law raises a strong presumption of its legality—not only casting the burden of proof on the party objecting, but requiring him throughout, in every particular, to make plain, against the constant pressure of this presumption, the truth of law and fact that it is illegal and void. So that this issue cannot be tried like the ordinary ones which are independent of this special presumption." (1 Bishop on Marriage, Divorce and Separation, 957.)

This prescription of the law by Mr. Bishop is, as we will later have occasion to cite, supported by eminent writers on the subject from the pioneer days of the common law to the present time.

It is the contention of respondent in the case at bar

that, in view of the relationship existing between the parties in the State of California prior to their coming into this state, this instruction was properly given. It is needless to observe that the relationship of the parties in California, at least prior to the time at which the respondent here secured her final decree of dissolution from her former husband, was meretricious and illicit. Respondent contends that not only in this condition presented by the record, but the relationship existing between the parties is made further illicit by reason of the habits and life of the parties themselves, in this: That respondent, while living in the State of California, and indeed during her residence in Nevada, was for a part of the time, at least, the mistress in a house of prostitution, and that the relationship existing between the parties was nothing more than that usually existing between a prostitute and her paramour.

Whatever there may be of merit in the contention of respondent, there is another phase to the case as presented by the record, and one which appellant here was entitled to have fully considered by the jury under proper instructions. The cohabitation or relationship entered by the parties in the State of California was, according to the testimony of appellant, that of husband and wife. He says they there agreed to live together as such. At that time he was engaged in the hack business in San Francisco, and she conducted a rooming-house. Whatever the relationship may have been in California, it was continued after the parties came to this state. The impediment which prevented a legal marriage between the parties in California was removed after the final decree of divorce was granted to respondent in California and after they had taken up their abode in this jurisdiction.

During their cohabitation in this state, certain things appear to have transpired between the parties which to our mind went a long ways toward establishing the marriage relation, and which, were it not for the erroneous instruction, the jury would undoubtedly have regarded as

constituting marriage between the parties. The parties here lived together at and in the premises here in question from 1907 until 1911. A daughter of respondent lived with them during a part, if not all, of that time. During a part of the time, an adopted infant, Roy De Bernardi, was maintained and cared for by the parties as their own child, at and in the premises in question. On September 26, 1907, appellant and respondent, as man and wife, executed an instrument of mortgage to the Washoe County Bank, of Reno, Nevada, by which instrument the very premises here in question were pledged as security to the bank for a loan of $7,500, and to which instruments the respondent here signed her name "Constance De Bernardi"; and the notarial acknowledgment to the instrument recites that:

"On the 26th day of September, in the year one thousand nine hundred and seven, * * * personally appeared Rick De Bernardi and Constance De Bernardi, his wife, known to me to be the persons described in and who executed the foregoing instrument, who acknowledged to me that they each executed the same freely and voluntarily and for the uses and purposes therein mentioned; and the said Constance De Bernardi was by me made acquainted with the contents of said conveyance, and she acknowledged to me, on an examination apart from and without the hearing of her husband, that she executed the same freely and voluntarily, without fear or compulsion or undue influence of her said husband, and that she does not wish to retract the execution of the same."

On January 4, 1908, the parties here executed, as man and wife, another mortgage, to Frank Bros. Company, a corporation of Washoe County, by which instrument they pledged certain bar fixtures and appliances in the saloon known and called "Rick's Resort," and other personal property at or about the same place, to which instrument of mortgage the respondent again signed her name "Constance De Bernardi." It appears from the record that on November 30, 1909, and while the parties were

living together at Rick's Roadhouse, or Rick's Resort, respondent and appellant instituted proceedings in the district court of Washoe County for the adoption of a child. An excerpt from the petition of the parties in the adoption proceedings is found in the record and reads as follows:

"That your petitioners are anxious and desirous of adopting the child, Edwin Baker Freeman, as their own, to have said child sustain toward each other the legal relation of parent and child, and said child to have all the rights, including the right of maintenance, protection, education and inheritance, and be subject to all the duties of that relation, and that the natural parents of said child be relieved of all parental duties toward and all responsibilities for said child and have no right over him."

And another excerpt from the same instrument reads:

"We promise and agree to properly raise, educate, maintain and care for the said Edwin Baker Freeman as our own child, and to always keep him in the best of surroundings and the best of associations and to comply with the adoption laws of the State of Nevada in each and every respect."

To this instrument we find respondent and appellant signing their respective names "Rick De Bernardi" and "Constance De Bernardi."

Pursuant to the proceedings for adoption of the child, it appears that the district court granted the prayer of the petitioners; and the child was thereafter known as "Roy De Bernardi."

A significant thing appears in the record in connection with this adoption proceedings, in the form of a postcard, which, according to the testimony of respondent, was mailed by her at Stanwood, Wash., while she was visiting with her relatives at that place, on which postcard, addressed as it is to "Mr. R. De Bernardi, Reno, Nevada, Box 132," we find the salutation: "Dear Papa." Then following a scribble, which according to the testimony of respondent was made by the child, we find the words: "Love, Roy."

It appears that in 1908 the parties visited the home of the parents of respondent in the State of Washington; that on the occasion of their visit to her father's home there was a family gathering, at which respondent's father, stepmother, brothers, and other members of her immediate family were present. Testifying as to this incident, respondent says:

"Q. Who introduced Rick to the other members of the family? A. Well, I guess I did.

"Q. How did you introduce him? A. As my husband.

"Q. As your husband? A. Yes, sir.

"Q. And if I understand you correctly, you agreed here to go up there and just be husband and wife for that trip, is that right? A. We didn't say just for that trip; we didn't say anything about that. I just agreed to introduce him as my husband to my folks; but I told him that he couldn't come along up to my folks, that we would go along to Seattle together, but that I couldn't take him home. He said, 'Well, you can introduce me as your husband'; so that is how it came that I took him along.

"Q. Well, did you agree while you were there to act as man and wife, or to live as man and wife? A. That was all, just what I told you, that we agreed to do.

"Q. And you did live there as man and wife, did you not? A. Under that agreement, just what you heard me say.

"Q. Did you live at your father's house in Washington with the defendant here, Rick De Bernardi, as man and wife? A. Yes."

From the testimony of the witness W. H. Caughlin, the party from whom the premises here in question were purchased and who lives in the neighborhood of the place known as Rick's Roadhouse, we find that on the occasion when the witness first met respondent it was on the introduction of appellant at the roadhouse, and on that occasion appellant introduced respondent as his wife.

From the testimony of the witness Frank D. King, the attorney who conducted the adoption proceedings in the

district court, we learn that on the occasion of those proceedings respondent gave the witness to understand that she was the wife of Rick De Bernardi.

From the record as it is made in the lower court, it would appear that the respondent here passed and transacted business and was known by several names. On some occasions she was "Hazel Ward"; on others she was "Constance E. Parker"; and at still other times she was "Constance E. De Bernardi." When it suited her convenience in negotiating a loan with the Washoe County Bank, she was "Constance De Bernardi," the wife of the appellant. When it suited her convenience in the adoption of a child, she was "Constance De Bernardi," and the child of her adoption was named after appellant. When it suited her convenience, she took appellant into the sacred precincts of her father's home, and there, surrounded by her relatives in the family circle, she introduced this appellant as her husband and lived with him under her father's roof as man and wife. When it suited her convenience, she even trifled with the most sacred sentiments of love and guided the baby hand of the child of her adoption in addressing appellant as "Papa."

All of these circumstances and conditions were presented to the jury by the evidence adduced at the trial. But the trial court in its instruction to the jury swept away all of these matters from their consideration in its statement of the law wherein it declared that inasmuch as the relationship existing between appellant and respondent in the State of California was illicit and meretricious, therefore the law presumed that this condition continued illicit and meretricious unless the proof showed by a preponderance thereof that a valid marriage contract was made and entered into between the parties in the State of Nevada.

3. Respondent here contends that the relationship of these parties, even conceding an agreement of marriage entered into in California, was at that time and in that state not only illicit and meretricious, but adulterous,

hence the court was justified in asserting the law to be as he stated it in his instructions. In other words, it is the contention of respondent that the agreement by the parties, if such there were, to live together as man and wife, was made in a state and at a time where and when, by reason of the impediment then existing with reference to respondent, such marriage was invalid; and being invalid, and there being no subsequent agreement to live together as man and wife after the impediment had been removed, the relationship between the parties continued, as in the first instance, to be meretricious and illicit. Such contention is not supported by the great weight of authority.

In the very early case in England entitled *Campbell* v. *Campbell*, Law Rep. 1 H. L. Sc. 182, subsequently referred to as the "Breadalbane Case," the House of Lords adjudged that, notwithstanding the fact that in the beginning the relationship existing between the parties was adulterous, yet a legal marital relation commenced as soon as the parties were, by the removal of the impediment, made capable of contracting marriage. The case then before the House of Lords was one in which a married woman had eloped and lived in adultery with her paramour. Prior and subsequent to the death of her husband, both she and the party with whom she had eloped made public utterances proclaiming that they were married. The Breadalbane case is again referred to by the House of Lords in a later controversy entitled *De Thoren* v. *Attorney-General*, cited in volume 1 of the Law Reports, Appeal Cases, H. L. Sc., at page 686. In the Breadalbane case above referred to, Lord Westbury took occasion to remark:

"There is nothing to warrant the proposition that the subsequent conduct of the parties shall be rendered ineffectual to prove marriage by reason of the existence, at a previous period, of some bar to the interchange of consent."

Continuing, he assumes to assert the rule that:

"There is no foundation for the argument that the matrimonial consent must of necessity be referred to the commencement of the cohabitation. * * * I think a

sounder rule and principle of law * * * that you must infer the consent to have been given at the first moment when you find the parties able to enter into the contract."

This language was again quoted with approval in the De Thoren case, *supra*. In establishing the rule applicable to such cases, Lord Chelmsford declared:

"If the cohabitation begins in an illicit intercourse, and is continued after the bar to marriage (whatever it may be) is known to be removed, habit and repute may have their proper operation upon the continuing cohabitation, which is not to be referred to the original intercourse."

Lord Selborne, in addressing himself to the subject under the Scottish law, said:

"It is, however, an error to suppose that what is called habit and repute is a mere element of proof directed to the establishment of the actual constitution of marriage at some moment of time, supposed to be single and definite, though not precisely ascertained by such mutual declarations as would be necessary for the direct proof of a marriage *per verba de præsenti*. Consent to be married persons (it matters not in what manner expressed, or whether expressed at all, otherwise than tacitly, *rebus et factis*) is all that is necessary to infer in these cases, from habit and repute—the mutual consent, and not the mode of declaring or interchanging it, being that which, by the law of Scotland, constitutes marriage."

This same doctrine was referred to in the early case of *Hyde* v. *Hyde,* 3 Bradf. (N. Y.) 509, wherein the court held that, where the intercourse had been in the inception meretricious, there must be evidence to show that the character was subsequently changed, but it was not indispensable to prove a ceremonial marriage. If the parties by their conduct and declarations professed to be bound by marital ties, and thus exhibited the continuation of their cohabitation upon a different footing from what it had formerly been, the conclusion may be in favor of marriage. In the case of *Morris* v. *Davies,* 5 Cl. & Fin.

163, Lord Lyndhurst, speaking of the consideration to be given in favor of marriage, said:

"The presumption of law is not lightly to be repelled. It is not to be broken in upon or shaken by a mere. balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory, and conclusive."

Much of the doctrine asserted by the early case of *Campbell* v. *Campbell, supra,* otherwise known as the Breadalbane case, has not been universally accepted by the courts of the several jurisdictions in the United States, but in the case of *Travers* v. *Reinhardt,* 205 U. S. 423, 27 Sup. Ct. 563, 51 L. Ed. 865, the supreme court, speaking through Mr. Justice Holmes, quoted approvingly from the decision of the House of Lords in that case:

"* * * That cohabitation as husband and wife is a manifestation of the parties having consented to contract the relationship *inter se.* It is a holding forth to the world by the manner of daily life, by conduct, demeanor, and habit, that the man and woman who live together have agreed to take each other in marriage and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors, friends, and acquaintances, to these representations and this continued conduct, then habit and repute arise and attend upon the cohabitation."

The Supreme Court of the United States in that case had presented to it facts and circumstances very similar to those presented by the record in the case at bar, and there, as here, the evidence supporting the marriage relation consisted, among other things, in the act of the parties in signing a mortgage as husband and wife, each of the parties signing the surname of the husband.

In the case of *Gall* v. *Gall,* 114 N. Y. 109, 21 N. E. 106, the court was dealing with a case where the evidence established illicit relations between the parties on the occasion of their first cohabitation, and where in the first instance nothing in their conduct or reputation indicated

the marriage relation.  Later, however, the parties lived openly together as husband and wife, and were recognized as such by their relatives and by parties in business transactions.  The court there held that, even though the intercourse was at first illicit and was not then accompanied by any of the evidences of marriage, yet inasmuch as it later assumed a matrimonial character and was surrounded by the evidences of a valid marriage, a question of fact arose for the determination of the jury.  It was for the jury to weigh the presumption arising from the meretricious character of the relationship in its origin, with a presumption arising from subsequent acknowledgments, declarations, repute, and so forth, and decide whether all of the circumstances taken together were sufficient evidence of marriage.

It will be observed that the instruction here complained of takes from the jury a very salient rule of law that has found sanction at the hands of most eminent authors, to the effect that every intendment of the law is in favor of matrimony, and wherever there is room for a presumption, it operates in favor of a valid marriage.  (*Shepard* v. *Carter*, 86 Kan. 125, 38 L. R. A. n. s. 568.)

The presumption in favor of a valid marriage has been declared to be one of the strongest known to the law. This is especially true where by the declaration of the parties such marriage has been asserted or where by their acts or conduct, together with their continuous cohabitation, such relationship has been established to their friends, relatives and associates.  This presumption of valid marriage is one which, in our judgment, may properly be indulged in, even though, as here, the circumstances indicate illicit relations in the first instance, but where, as here, the parties, after the removal of the impediment by which their relations were made illicit, continued to cohabit; and especially is this presumption to be indulged in where, as in the case at bar, we find the parties transacting business as husband and wife and otherwise openly and publicly declaring their relationship.

To this effect we find the very recent case of *Haywood* v. *Nichols*, 160 Pac. 982; and to the same effect are the cases of *Shepard* v. *Carter, supra,* and *Schuhart* v. *Schuhart,* 78 Am. St. Rep. 342.

In a leading case which deals at length and learnedly with the subject under consideration, wherein the courts of New York had occasion to pass upon a similar question, it was, as we think, properly held that the common law presumes marriage; that is, it presumes every marriage legitimate until the contrary is shown, as it presumes every man innocent, and that every man obeys the mandate of the law and performs his social and official duties until the contrary is shown. (*Caujolle* v. *Ferrie,* 23 N. Y. 90.)

In our research for authority on the subject at hand and for light to guide us in the proper interpretation of the rule, we have found no jurisdiction in which meretricious cohabitation has been dealt with more severely than in the courts of the State of New York. (*Bates* v. *Bates,* 7 Misc. Rep. 547, 27 N. Y. Supp. 872; *Foster* v. *Hawley,* 8 Hun, 68; *Wilcox* v. *Wilcox,* 46 Hun, 32, 10 N. Y. St. Rep. 746; *Chamberlain* v. *Chamberlain,* 71 N. Y. 423.)

The tenor of the decisions in these cases is to the effect that if the cohabitation is meretricious in its origin, its continuance must be presumed until proof of a change and of marriage. Hence, Mr. Wattershall, in his work on The Law of Domestic Relations in the State of New York, page 14, asserts the rule as established in New York to be that an illicit relation between man and woman is presumed to continue as such. It will never ripen into marriage until the parties by a new agreement make the relation matrimonial. But, notwithstanding the earlier cases as reported from the several courts of New York, which to a greater or less extent support this rule, and notwithstanding the apparent tendency of the courts of that jurisdiction to hold rigidly to such a doctrine, we find what we deem to be a more modern and humane rule, and indeed one which to our mind more correctly conforms to the spirit of the common law as interpreted

by the earlier writers, asserted in such cases as *Fenton* v. *Reed*, 4 Am. Dec. 244, and *Caujolle* v. *Ferrie, supra,* and the case of *Hynes* v. *McDermott*, 91 N. Y. 451, 43 Am. Rep. 677.

In the latter case, the Court of Appeals of New York took occasion to remark:

"The presumption of marriage, from a cohabitation apparently matrimonial, is one of the strongest presumptions known to the law. * * * The law presumes morality, not immorality; marriage, and not concubinage; * * * where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."

And in that case we find the learned justice who delivered the opinion of the court quoting with approval the language of Lord Lyndhurst in the case of *Morris* v. *Davies, supra.*

In the case of *Gall* v. *Gall, supra,* the court dealing with the question of presumption in such matters, stated the rule to be that where it is admitted that the cohabitation of the parties was illicit in its origin, the presumption is that it was continuous, and before it can be characterized as a lawful relation, proof is required of such acts and circumstances as indicate that the relation has ceased to be illicit and becomes matrimony. However, the court said:

"It is sufficient if the acts and declarations of the parties, their reputation as married people and the circumstances surrounding them in their daily lives naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife."

In the case of *Tracy* v. *Frey*, 88 N. Y. Supp. 874, the matter of the application of the rule of presumption as it has been applied by the courts of the State of New York is gone into at length.

The doctrine asserted in the case of *Gall* v. *Gall, supra,* we find approved in the later case of *In Re Terwilliger's Estate*, 118 N. Y. Supp. 424. In the latter case,

sanction is given to the principle that even where the relation in its inception was meretricious, and although there was no proof of any ceremonial marriage or other contract of marriage thereafter, yet subsequent marriage relation may be presumed from the continued cohabitation and from such acts and declarations as indicate the intention of the parties to assume the legitimate marital status.

Hence we may observe that, even under the rigid rule adhered to by the courts of New York, the instruction here given, and which is here assigned as error, would not have received sanction. Under the instruction as given by the trial court in the case at bar, nothing short of a preponderance of the proof sustaining a valid marriage contract made and entered into between the parties in the State of Nevada would support the existence of the marital relation. This instruction, in the way in which it was given, took from the jury the long-established rule of presumption in favor of the legitimacy of the marriage relation. But it did more than that; it called for the establishment by a preponderance of proof of the actual making of a valid marriage contract by and between the parties after the impediment which existed with reference to the respondent here had been removed. The jury could view this instruction in no other light than calling for proof of another and new agreement, either verbal or in writing, entered by the parties after they came to Nevada.

We have referred to the rule asserted by the early writers upon the subject, and we find this supported and sustained by a strong line of modern authority. We think a correct statement of the rule to be that, where the cohabitation was illicit or meretricious in the beginning, the burden of proof is upon those asserting a valid marriage, nevertheless there is no presumption that the relationship continued to be illicit. It is a matter of proof, and not of presumption, whether the relationship continued to be illicit, or whether it was changed to a legal and moral status; and the only presumption to be indulged

in in such matters is in favor of the legitimacy of the relationship.   Moreover, we are of the opinion, in the light of what we deem the weight of recent authority, that the rule would be more correctly stated to say that, although cohabitation between a man and woman was in the first instance illicit or meretricious, a valid marriage under the common law may be shown by proof that the parties sustained toward each other the relation of husband and wife after the impediment to their marriage had been removed.   This doctrine we find supported by eminent authority.   (*Coad* v. *Coad*, 87 Neb. 290, 127 N. W. 455; *Prince* v. *Edwards*, 175 Ala. 532, 57 South. 714; *Drawdy* v. *Hesters*, 130 Ga. 161, 60 S. E. 451, 15 L. R. A. n.s. 190; *Darling* v. *Dent*, 82 Ark. 76, 100 S. W. 747.)   And to the same effect is the case of *In Re Fitzgibbons*, 162 Mich. 416, 127 N. W. 313, 139 Am. St. Rep. 570.

In our judgment the language of the trial court as used in this instruction conveyed an erroneous impression to the jury, by reason of which they were misled; for, even though it may be contended for as a proposition of law that where at the inception the relationship is illegal or illicit, and the presumption of the continuance of such relationship applies until there is a change in the circumstances, yet even then and under such conditions the presumption of marriage is warranted, where a very slight change is indicated by the habits or declarations of the parties.   (*Smith* v. *Smith*, 84 Ga. 440, 11 S. E. 496, 8 L. R. A. 362.)   Even where the only proof in the case is of continuous cohabitation, the jury may be warranted in indulging in the presumption that it is lawful. But where to this is added some affirmative proof of the parties having held themselves out as husband and wife, as in the case at bar, it adds just so much to the force of the presumption.   (1 Andrews, American Law, 2d ed. sec. 486.)

In the case of *Drawdy* v. *Hesters, supra,* the question was considered under circumstances presented by the record somewhat similar to the matter at bar.   An instruction was offered containing the words:

"I charge you that marriage arises and exists in contract, and it needs to be proved as other civil contracts, when property rights are involved and depended upon."

The Supreme Court of Georgia, in passing upon the proposed instruction, said:

"The use of the words 'and it needs to be proved as other civil contracts' is rather indefinite, and tends to minimize the value of evidence of general repute and the effect of parties holding themselves out as husband and wife."

In the case of *Darling* v. *Dent, supra,* the court had presented to it the case of a married woman having separated from her husband and having gone into a foreign state, there cohabiting with the man Darling, the cohabitation continuing for some time. The impediment to a legal marriage relation with Darling was removed only by the death of her husband. The court took occasion to remark that:

"While it is true that, if it be shown that the relations between Darling and Mrs. Williams were illicit in the beginning, the burden is upon those asserting a valid marriage agreement to show that such an agreement was afterwards entered into, still there is no presumption that the relationship continued to be illicit. It is a matter of proof, and not of presumption, whether the relationship continued to be illicit, or whether it was changed to a legal and moral status. Whatever presumptions are indulged are in favor of the legitimacy of such relationship."

Supporting this doctrine will be found the very recent case of *Davis* v. *Whitlock,* 90 S. C. 233, 73 S. E. 171, Ann. Cas. 1913D, 538; and to the same effect is *Adger* v. *Ackerman,* 115 Fed. 124.

. The courts of Maryland have held, with a uniformity quite unvarying, that there cannot be a valid marriage without a religious ceremony. (*Richardson* v. *Smith,* 80 Md. 89.) Notwithstanding this, we find in the early case of *Redgrave* v. *Redgrave,* 38 Md. 93, the court recognized the doctrine that:

"Where parties live together ostensibly as man and wife, demeaning themselves towards each other as such, and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married."

In support of this proposition, the court referred to the cases of *Hervey* v. *Hervey*, 2 W. Bl. 887, *Goodman* v. *Goodman*, 28 L. J. Ch. 1, and *Jewell* v. *Jewell*, 1 How. 219.

In referring to the usual manner of proof by which the marital status might be established, the court reaffirmed the law as pronounced in *Boone* v. *Purnell*, 28 Md. 607, to the effect that:

"The most usual way of proving marriage, except in actions for criminal conversation and in prosecutions for bigamy, is by general reputation, cohabitation, and acknowledgment."

The Supreme Court of Colorado, in the case of *Henry* v. *McNealey*, 24 Colo. 458, quoted approvingly from Bishop on Marriage and Divorce, to the effect that:

"When a man and woman are living together in apparent matrimony, so that they are accepted by the community as husband and wife, they are presumed, in the absence of counter presumptions or proofs, not to be violating the due order of society and breaking the law, but to be in fact married."

Continuing, the court said:

"This presumption, it will be seen, is founded upon the maxim that fraud and covin are not generally presumed; the presumption of the law being usually in favor of honesty and morality."

4. Counsel for respondent contends that, whatever cohabitation there might have been by the parties in this state, such can raise no presumption of common-law marriage, and that their cohabitation in this state was not such as the law requires to raise that presumption; and in this respect much stress is laid upon the fact that the respondent conducted a house of prostitution in Reno and resided therein at times. We are not unmindful of

the facts presented by the record as to the private life of both of the parties to the controversy.   We know of no rule of law, at least none such as would be applicable here, that would prevent a prostitute from intermarriage with her paramour.   Certainly, if under such conditions marriage were not performed by the usual and ordinary ceremony, it might, by reason of the conduct of the parties, require a higher degree of proof.   A jury impaneled to determine the question of the marriage status of the parties should be permitted to consider the evidence under a correct rule of law; and while prostitution or immorality might militate against the presumption of legitimacy, nevertheless such is for the jury to consider under proper guidance.   There was evidence in this case going to establish a mode of life which if taken alone would not be conducive to the presumption of a marriage relation; but, on the other hand, there was evidence of cohabitation, coupled with utterances and declarations by the parties at times far remote from the occasion of any controversy.   The instruction of the court deprived the appellant of the force and effect of this evidence.

Speaking on the subject of the proof necessary to establish the marriage relation where the same is claimed *per verba de præsenti*, the Supreme Court of the United States, in the case of *State of Maryland* v. *Baldwin et al.*, 112 U. S. 490, speaking through Mr. Justice Field, gave expression to a principle of law which we deem quite applicable to the matter at bar; and in that respect the court held that to meet the considerations of public policy in such matters, public recognition was necessary; and, exemplifying this principle, the court said:

"And it may be made in any way which can be seen and known by men, such as living together as man and wife, treating each other and speaking of each other in the presence of third parties as being in that relation, and declaring the relation in documents executed by them whilst living together, such as deeds, wills, and other formal instruments.   From such recognition the

reputation of being married will obtain among friends, associates and acquaintances, which it is of itself evidence of a persuasive character."

The parties are not here, nor were they in the court below, on trial for their moral conduct; and even though she was a prostitute, as she declared herself to be, if a marriage of the highest and most sacramental order had been performed between the parties it would have had no more binding effect than a common-law marriage *per verba de præsenti* actually consummated. If in this union property was acquired which in its nature was community property, his rights therein, as well as hers, are to be settled, not by their moral standing in the community, but by the law.

If he declared her to be his wife in her presence and in the presence of others on occasions when to save the property in question they pledged it as security for a loan, and if she on such occasions, and while she lived and cohabited with him on the premises, signed such mortgage as his wife and with his name, and if on that occasion the relationship of husband and wife existed between them under the common law, is the relationship less now that she denies such because by so doing it may be to her advantage? If she was the wife of appellant when they mutually asserted that fact in the giving of a chattel mortgage to Frank Bros., in which instrument other property than the Rick Roadhouse was pledged, and if then they declared that by common law they were married, when did the common law become ineffective as binding their connubial relations? If at common law they were man and wife for the purpose of adopting a child and giving it the name which each declared to be theirs, are they now less man and wife when, to gain possession of the premises in which for years they cohabited, one of the parties finds it more advantageous to deny such relationship?

As we view the law applicable to the subject, interpreted by jurists and text writers from the very earliest times,

as well as under the present and more modern theory, the appellant here was entitled to have the facts and circumstances presented in the light of a different instruction. The instruction here complained of set at naught all of the circumstances arising out of the transactions wherein the parties had publicly and privately recognized each other as husband and wife, and where the respondent in transacting business and in invoking the power of the courts in times past had given evidence in no uncertain way that she was the wife of appellant. The error complained of was one vital to the issues.

The order appealed from is reversed, with instructions to the lower court to grant a new trial.

It is so ordered.