[Civ. No. 12416.   First Dist., Div. One.   July 26, 1943.]

Estate of DANIEL T. KEIG, Deceased. EDITH KEIG, Appellant, v. R. E. KEIG et al., Respondents.

O'Gara & O'Gara and John O'Gara for Appellant.

Palmer and York for Respondents.

WARD, J.—Petitioner Edith Keig, claiming to be the common-law spouse of Daniel T. Keig, deceased, appeals from a judgment and decree, following a verdict by a jury, determining that she was never married to him, is not his surviving wife and is not entitled to any interest in his estate. The respondents are the brother, sisters, and the children of a predeceased brother.

The petitioner was the daughter of the housekeeper and cook for Mr. and Mrs. Keig and was in the habit of visiting her mother at their home in the year 1927 while she was a first year high school student. The Keigs, who were childless,

became interested in her and, although at that time her mother no longer worked for them, they took her into their home at the commencement of her second year in high school, and for the next three years she lived with them. During this period the Keigs also had in their home a young niece of Mrs. Keig and both girls were treated as members of the family. In 1931 petitioner went to work at one of the business enterprises of Mr. Keig in Napa and continued to work in businesses in which he was interested until the time of his death. After she started to work, and prior to the death of Mrs. Keig in 1940, she was in the habit of taking lunch at the Keig home; she accompanied Mr. and Mrs. Keig to the theatre and on trips, remained in their home while they were abroad and was on terms of friendship with them both. She testified that during this period, as time went on she and Mr. Keig became very much in love, and frequently kissed and embraced each other; that the affair, however, never went any further; that she knew she was not doing the right thing and so told Mr. Keig; that he and she discussed his obtaining a divorce in order to marry her, but decided that it would not be the fair and just thing to do. She further testified that in November 1940, following his wife's death in July, Mr. Keig asked her to marry him, and that she consented, although no time was set for their marriage partly because she realized that it would cause talk, and, since her sister was to be married very soon, she preferred to do nothing at that time which would mar the latter's happiness. She testified that on different occasions she and Mr. Keig spoke of places where they could be married, Mr. Keig desiring to keep the marriage secret because of the opposition of his family. On March 14, 1941, prior to a contemplated trip to Nevada the next day for the purpose, as petitioner testified, of being married, Mr. Keig purchased an engagement and a wedding ring for her. She accepted the engagement ring but declined to keep the wedding ring in her possession "because I—I think it is bad luck to have a wedding ring in your possession before it is given to you." The parties left Napa for Nevada in Mr. Keig's automobile on Saturday evening, intending to remain for the week end. They took turns driving, and, petitioner testified, had some little disagreement en route as to when drivers should change, Mr. Keig saying at the time "My little wife is not going to be cross with me, is she?" This remark, petitioner stated, was made after they had crossed the Nevada state line. Petitioner said she realized the childishness of

arguing about so trivial a matter, said she was sorry, and they kissed, made up and continued their trip. They registered at a hotel in Reno as Mr. and Mrs. Thomas of Vallejo at about 1:45 a.m., petitioner testifying in this regard that Mr. Keig went into the hotel first and registered; then came out for her, saying "All right, Mrs. Thomas, will you come in?" They were desirous of obtaining some tea—something warm—but the coffee shop was closed, so, on the way to their room, at the suggestion of the bell boy, they ordered buttered rum from the bar. This was brought to their room, where they had partially disrobed, and, petitioner testified, they drank a toast to their new life together. Shortly after being shown to their room, Mr. Keig suffered a stroke of paralysis from which he did not recover. There is testimony that petitioner told the doctor who was summoned, also a nurse at the hospital to which he was taken, that she was not the wife of Mr. Keig, but his friend; that they had come to Reno to be married. She testified, also, that in consenting to occupy a room with him she had insisted that there be twin beds, and that she had never had carnal knowledge of any man, including Mr. Keig.

It is petitioner's contention that the evidence supports a "common-law" marriage between herself and Mr. Keig by mutual consent or agreement, valid under the Nevada statute and entitled to recognition in California.

Petitioner testified that she did not know anything about common-law marriages; that she and Mr. Keig had planned for a ceremonial marriage, but that the details thereof had not been decided upon; that at the time of Mr. Keig's stroke, and even after his death, her impression was that they had not been married; that prior to leaving Napa, Mr. Keig gave her about half the money he planned taking on the trip "in case either of us lost it, why we would always have sufficient money. That was his habit." She later asked Mr. Keig's sister whether it was proper for her to keep the money since she and Mr. Keig had "not married." For a period of six months petitioner used her maiden name, and during this period she did not in any way hold herself out, or claim to be the widow of Keig.

Respondents contend that the evidence would not support a finding of common-law marriage by mutual consent, and that, in addition, in order to constitute a valid marriage in Nevada, there must have been an open assumption of marital rights, duties and obligations.

█ The least that is necessary to establish a valid common-law marriage in any jurisdiction is mutual consent of the parties. The weight of authority, however, seems to be that there must be some evidence of consummation or a holding out that the parties are married by their living together, or in some way showing that the marriage relationship exists.

█ The law of the place of marriage normally controls the question of its validity. (Civil Code, sec. 63; Restatement, Conflicts, sec. 121; 5 Cal.Jur. 441; 18 R.C.L. 388; 39 A.L.R. 559.)

Section 4050 of the Nevada Compiled Laws of 1929 provides: ''That marriage so far as its validity in law is concerned is a civil contract to which the consent of the parties capable in law of contracting is essential.''

Both parties to the appeal cite and rely upon the following four Nevada cases, placing their respective favorable constructions thereon: *State* v. *Zichfeld*, 23 Nev. 304 [46 P. 802, 62 Am.St. Rep. 800, 34 L.R.A. 784] ; *Parker* v. *De Bernardi*, 40 Nev. 361 [164 P. 645] ; *Clark* v. *Clark*, 44 Nev. 44 [189 P. 676, 194 P. 96] and *Dahlquist* v. *Nevada Industrial Commission*, 46 Nev. 107 [206 P. 197]. The facts of all these cases differ from those herein. In all four there was a mutual agreement, followed by some action of general repute or otherwise showing the relation of a marriage. The opinions in the first three cases could be construed to mean that the Nevada statute required only consent, but in the Dahlquist case the question is set at rest. The court there said (p. 199 [206 P.]) : ''A marriage, whether of common-law or ceremonial character, is the consequence of a contractual relationship. In the one case it is the result of present assent, between parties capable of contracting marriage, *followed by subsequent cohabitation as husband and wife, and the holding out to the world of each other as such*. Such a marriage has all the binding force of a ceremonial marriage; and one who enters into such a marriage without being divorced, may, during the lifetime of such a common-law spouse, be guilty of bigamy, as was held by this court in *State* v. *Zichfeld*, 23 Nev. 304, 46 P. 802, 34 L.R.A. 784, 62 Am.St.Rep. 800 (italics added).

''We think the rights, obligations and liabilities of those entering into a common-law marriage have been clearly established by this court in the following cases: *Parker* v. *De Bernardi*, 40 Nev. 361, 164 P. 645 ; *Clark* v. *Clark*, 44 Nev. 44, 189 P. 676, 194 P. 96.'' █ If there is any conflict in the opin-

ions, the latest should be given preference. (7 Cal.Jur., p. 630, sec. 38.) The opinion in the Dahlquist case is in harmony with the modern and reasonable trend of thought that there must be a consummation of the contract which results in honest wedlock for the purpose of establishing a home.

In common-law marriages in which the contract is admitted, proof of "holding out" is less essential though such fact may appear as a matter of evidence. Consent is the primary essential in proof of the claim of a marriage contract. The seeming conflict in decisions arises merely as the result of statements in opinions dealing with specified facts, secret contracts or illicit relations. (35 Am.Jur. 198, 33 A.L.R. 27, 133 A.L.R. 758.) In some jurisdictions proof of cohabitation is not necessary, but under any circumstances evidence of cohabitation is always admissible as proof tending to show mutual consent. The holding in the Dahlquist case places Nevada definitely in the list of states requiring subsequent cohabitation or proof of repute as essential in establishing a valid marriage from the outset. For this reason the giving of certain instructions claimed by petitioner to be erroneous was proper. The instructions were directed to the general theory that there must be repute among intimates and associates that the parties are husband and wife.

It was not error to instruct the jury relative to the law of California. It was necessary to impress upon the members thereof that the law of Nevada was controlling and that they were not bound by the California law which does not permit common-law marriages. The instruction was proper because the basis of petitioner's claim is that the agreement of marriage was made while traveling from Napa to Reno. There is evidence that the statement of decedent—"My little wife is not going to be cross with me, is she?" was made after the parties had crossed the Nevada boundary line, but the jury was not bound by that testimony. Impliedly the jury found that such statement did not constitute mutual consent to marriage. Petitioner's reply was in effect that she was sorry she had been cross. The above question claimed to have been made by decedent is the only one in which he referred to petitioner as his wife. After deliberating the jury returned to the court room and requested further instructions. It was made plain that the subject of confusion arose from the following instruction: "THE COURT: . . . I will read you this further instruction which I gave before. (reading) 'The

consent to the marriage must be mutual—that is to say, each must have been in agreement with the other to take the other as his or her spouse forthwith or presently. They must have agreed that they were married by their agreement and the consent must be to enter into the matrimonial union. Thus, if you find that Daniel T. Keig entered into an agreement to marry the petitioner at a future time, that alone would not amount to a common law marriage. It is necessary, that there be a consent by both parties that by mutual agreement they enter into the matrimonial union permanent and exclusive of all others and at the time of the agreement.' Is that the one you have in mind? A JUROR: . . . Yes, that answers my question.'' Thereafter the jury returned a unanimous verdict against petitioner.

The conversation referring to petitioner as ''my little wife'' was made, and may have been received, in jocular vein, having reference to the marriage ceremony the parties expected to have performed in Reno. If decedent at the time considered petitioner his wife, there was no purpose in registering at the hotel under an assumed name and giving a false place of residence upon the theory that ''if someone from Napa . . . sees the hotel register, they will know that we are married.''

■ Assuming that decedent intended a contract of marriage, it still appears that there was no mutual agreement unless petitioner knew and understood the purport of his question. It appears that petitioner also expected a marriage ceremony to be performed and refused to wear the wedding ring until such time; that she did not know anything about common-law marriages; that she did not claim while in Reno to be decedent's wife, nor, upon her return to Napa, his widow, until six months later.

Consent is not mutual unless each party agrees in the same sense on the terms of the agreement. There is evidence in this case that the parties intended to enter into a contract of marriage in the near future, but, as stated, there is no evidence of any change in the situation by anything that occurred on the road to Reno or thereafter. (*Terry* v. *White,* 58 Minn. 268 [59 N.W. 1013].) Following the death of Mr. Keig, and until approximately six months later, whenever the occasion arose, petitioner denied that she was the wife of Mr. Keig and did not do the one act that might be considered in her favor—she did not wear the wedding ring. In Nevada to constitute a common-law marriage, it is necessary that it be ''by words of present assent.'' (*Parker* v. *De Bernardi, supra,*

p. 646; *Dahlquist* v. *Nevada Industrial Commission, supra.*)

Some comment is made by petitioner with reference to reading a decision from Nevada during the trial. The record discloses that counsel for petitioner agreed that the whole case should be read if it was deemed advisable. (Code Civ. Proc., sec. 1902.)

Each side introduced a witness skilled in the laws of the state of Nevada (Code Civ. Proc., sec. 1902), and the trial court took judicial notice of such laws, and their interpretation in Nevada as demonstrated by the instructions to the jury, which was sufficient. (Code Civ. Proc., sec. 1875.) An expert witness, introduced by respondents, testified as to the proper construction of the Nevada statutes as applied to certain hypothetical facts. This method of approach in proving the Nevada law is not to be commended, but appellant may not complain if, in accepting proof of the law of another state or territory, "the court adopted a wrong method of reaching a right conclusion." (*Duluz* v. *Alaska Packers' Assn.,* 177 Cal. 465, 470 [170 P. 1133].) The scope of section 1902 seems to have been considered rather broadly and leniently. In *Estate of Faber,* 168 Cal. 491, 495 [143 P. 737], it was held that one skilled in the law need not be "a lawyer, or a professor of law." Assuming that there was error in the questions propounded, and in the answers thereto, it may not be held prejudicial in view of the admitted fact that there was no cohabitation, and impliedly, by the verdict, no assent to a common-law marriage.

In view of the conclusion reached, it is not necessary to pass upon the additional contentions of respondents.

The judgment is affirmed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied August 25, 1943, and appellant's petition for a hearing by the Supreme Court was denied September 23, 1943.