(7 Misc. Rep. 547.)

## BATES v. BATES.

(Superior Court of New York City, Special Term.  February, 1894.)

1. MARRIAGE—PRESUMPTION.
   Where the relation between the parties was meretricious in its inception, marriage will not be presumed from cohabitation and reputation, but proof of a subsequent actual marriage is necessary.

2. SAME—CERTIFICATE OF THE PARTIES.
   A paper signed by a man, to the effect "that A. is my true and beloved wife, whom I love, honor, and cherish," is not sufficient to prove a marriage, where the facts tend to show that it was given to enable the woman to conceal illicit intercourse.

3. TRIAL—REQUESTS TO FIND.
   Where the whole case turns on a single question, a request for 283 separate findings of fact, most of which relate to isolated pieces of evidence, will be refused.

Action by Annette F. Bates against Charles F. Bates for separation and alimony on the ground of abandonment and nonsupport. Complaint dismissed.

Horwitz & Hirshfield, for plaintiff.
Miller, Peckham & Dixon, for defendant.

FREEDMAN, J.    This action is brought by the plaintiff, claiming to be the wife of the defendant, for a separation and for alimony on the ground of abandonment and nonsupport.    The defendant denies the alleged marriage.    Plaintiff's claim rests upon a so-called "common-law marriage," alleged to have been entered into on the 16th day of July, 1890.    The burden is upon the plaintiff to establish her case by a preponderance of evidence.    The case presents a sharp conflict of testimony which is difficult of solution.    The testimony of the parties cannot be reconciled, and hence, in order to determine which of them is to be believed, resort must be had to such surrounding circumstances as show, or tend to show, in whole or in part, the truth or untruth of their respective statements.    Under the operation of this rule, neither is to be believed to the exclusion of the entire testimony of the other, and either may be believed as to such parts which stand corroborated.    If necessary, a fact may be found in opposition to the testimony of both, if sustained by other credible testimony, or deducible from established facts or circumstances, or from the probabilities fairly arising from established facts and circumstances.    Now, the defendant testified to the effect that long before the date of said alleged marriage it had been agreed between him and the plaintiff that they should be intimate with each other, and that for that purpose they had met at various times and places, which were described.    The plaintiff denied every charge thus made against her, but she stands alone in her denials.    Witnesses for whose absence she did not account, and whose testimony, in all probability, would have been material, she did not call.    Her denial that she ever knew a place called "The Widow's" she had to retract when she was confronted by her own letter, in which she asked the defendant to meet her there.    As to other important particulars, the defendant stands corroborated by the testimony of his coachman.    Other and highly important corroborative evidence in favor of the defendant is furnished by the entries in the book of Seaman, the keeper of a livery stable, and by the testimony of one of the drivers employed by Seaman, who drove the plaintiff and the defendant to a place of bad repute, left them there, and after the lapse of some hours called for them again.    This driver is a wholly disinterested witness, and he appears to be entirely trustworthy.    The circumstances under which the plaintiff made the acquaintance of the defendant strongly suggest that she was then a woman of loose morals, and her whole conduct thereafter was inconsistent with purity of character.    Even her correspondence corroborates defendant's claim, for the passage in one of her letters, "I thank God I did not reveal our relations to mamma to-night," unmistakably refers to her illicit intercourse with the defendant.    Upon the whole, the evidence clearly shows that prior to July 16, 1890, the relation between the parties was a meretricious one.

The fact having been established, the authorities agree that its continuance must be presumed until proof of a change and of a marriage, and that in such a case marriage will not be presumed

from cohabitation and reputation, but proof of a subsequent actual marriage is necessary.    This may be shown by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and to satisfactorily prove that it was changed into that of actual marriage by mutual consent. Foster v. Hawley, 8 Hun, 68; Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Williams v. Williams, (Wis.) 1 N. W. 82; 17 Abb. N. C. note, p. 508; Bish. Mar., Div. & Sep. § 977.    The prime requisite to a valid marriage under our law is the interchange between the parties of a mutual present consent, per verba de praesenti, to take each other as husband and wife.    This consent is of itself fully sufficient, and for it there is no substitute or equivalent.    The modes of proving the existence of such consent are various, but they should never be confounded with the consent itself, which is always the same.    Proof of cohabitation as husband and wife does not constitute marriage.    It may, in some cases, be evidence of marriage.    It can never be anything more.    "Consensus, non concubitus, facit nuptias," is the universally received maxim.    If the agreement is not one of present consent to accept each other as husband and wife, but is per verba de futuro, looking to a marriage at some future time, it not only fails to prove actual marriage, but, by its very terms, excludes any such conclusion.    The plaintiff claims, and has testified, that an actual marriage by mutual consent took place on the evening of July 16, 1890; that at that time, although no witness was present, she and the defendant contracted a so-called "common-law marriage" by mutually agreeing to become then and there husband and wife; that the main reason why they adopted that form rather than a ceremonial marriage was to prevent information of the fact from coming to the ears of defendant's father; that from the time of such marriage they kept in each other's company that evening; that during the night immediately following they cohabitated as man and wife at the house of plaintiff's mother; and that defendant left said house at about 5 o'clock the next morning, because, as he said, it was necessary to meet his father at the breakfast table, according to his father's commands.    Under the laws of this state a marriage may be thus contracted, as already stated, but it must be a marriage per verba de praesenti, evidencing mutual consent to immediately become husband and wife.    If, as such, it is clearly established, it is as valid as any other; but whenever it is challenged it is the duty of the courts to see to it that the proof concerning it is clear and convincing, for it is somewhat improbable that any two persons who honestly and intelligently contemplate an immediate marriage should not enter into it in some form which renders future controversy concerning the fact of marriage almost impossible. To a virtuous woman nothing is of greater importance.    To a man respecting, and intending to respect, the woman whom he proposes to make his wife, it is of almost equal importance.    The legitimacy of his children depends upon it, and the future standing and position in social life of his wife depend upon it.    Moreover, it is quite as easy to make a marriage, intended for the mo-

ment to be kept secret, in such form as will make and leave the fact of such marriage almost beyond any possible controversy, as it is in the case of a public marriage. Now, the plaintiff in the case at bar is without a single witness to the alleged marriage, except that her mother claims to have seen the defendant depart from her house about 5 o'clock the next morning,—an occurrence as to which she may well be mistaken, because similar occurrences happened thereafter. As to all the material matters relating to this alleged marriage, and the alleged cohabitation in connection therewith during the first night thereafter, the plaintiff stands contradicted by the positive denials of the defendant; as to the principal reason assigned by her for keeping the marriage secret she stands contradicted by the testimony of defendant's father; and as to her claim of cohabitation during the night in question she stands contradicted by the testimony of defendant's sister. The latter's testimony, supported by her diary, clearly establishes that that night, owing to his mother's sickness, the defendant remained in his father's house, and held himself ready to be called by his sister, in case his assistance was needed, and that he could not have been at the house of plaintiff's mother, as testified to by the plaintiff. The character of defendant's sister appears in a very favorable light; she seems to be a noble woman; her testimony bears the impress of truth upon its face, and she cannot be mistaken. The conclusion is, therefore, unavoidable that the marriage did not take place as alleged by the plaintiff.

What, then, is there left of plaintiff's case? She does not claim that any marriage took place at any other time or place. She shows, however, that the defendant, at various times and places, and in the presence of different persons, called her his wife. The testimony upon this branch of the case is too voluminous to be referred to in detail, and such discussion would serve no useful purpose, even if it were practicable. Suffice it to say that upon a close analysis it appears that these were times and occasions when it became necessary to keep up a pretense of respectability or to avoid censure, and that opposed to the claim based upon this testimony are testimony and proof of facts and *circumstances from* which it clearly and convincingly appears that plaintiff's conduct and whole mode of life, inclusive of her correspondence, subsequent to the alleged marriage, were inconsistent with her present claim; that there was only such irregular intercourse between the parties thereafter as fancy or passion dictated; that the plaintiff continued to receive from the defendant checks made payable to her as A. F. McGrath, and to indorse such checks by that name, which was her maiden name; and that in June, 1893, in order to obtain some valuable jewelry from the person of one Ferguson, who was brought, severely wounded, in an ambulance to a hospital, she claimed to be the wife of the said Ferguson. Even some of the checks given to her, which were drawn "to cash," were voluntarily indorsed by her in her maiden name. Her letter written in 1893 to her "friend" Miller, in which she acknowledged prior pecuniary assistance from him, and invited him to come and spend a couple

of hours with her at a certain hotel, and promised him a merry time if he would come, is a pretty good sketch of her true character, drawn by herself.

So far, then, the plaintiff has failed to make out a case. It now remains to be seen what effect is to be given to the paper claimed by the plaintiff to be the certificate of her marriage. Assuming for the present its authenticity, it does not purport to be, and it is not, an agreement between the parties evidencing an honest intention on their part to thereby constitute themselves man and wife without any further formality or ceremony. It is in no sense a contract, but only evidence of a contract previously 'entered into. It says: "This is to certify that Annette F. McGrath is my true and beloved wife, whom I love, honor, and cherish." . This appears over the alleged signature of the defendant. The plaintiff incurs no obligation therein, and she does not certify that any obligation was incurred by her. Her signature appears, however, attached to it, but not under and following the signature of the defendant, but under and following the date of the certificate which appears between the two signatures. The paper, therefore, if genuine, is simply evidence of recognition of a status then existing; and the fact that the statement is in writing does not entitle it to any greater legal effect than a verbal statement to the same effect would be entitled to if clearly shown to have been made. We therefore come back to the question whether there was a sufficient prior marriage contract per verba de praesenti. Upon this point the plaintiff, in answer to an inquiry made by her own counsel as to the circumstances under which that paper was written, and as to what then and there occurred, testified that she did not consider mere words binding,—that she did not consider that a verbal agreement constituted a marriage,—and that she wanted an evidence of it which she could show to her family. Her understanding of that paper, therefore, was that it was no more than an evidence of a verbal agreement, which she admits did not, in her opinion, constitute a marriage. Where, then, is the complete marriage contract by mutual consent, whereby the parties finally and irrevocably immediately took each other as husband and wife? If, therefore, the paper in question was executed by the defendant, a good reason for its execution readily appears, and such reason, although unsustained by direct testimony, is in such case supported by the facts and circumstances surrounding the execution, and by the probabilities fairly deducible from such facts and circumstances. It has been shown beyond question that prior to July 16, 1890, plaintiff had been intimate with defendant. She and he, no doubt, desired to continue such intimacy with more freedom, and within the house occupied by her mother. The plaintiff realized that her mother might prove an obstacle to the gratification of her desires at home. To accomplish her purpose, and to shield herself against censure, she procured the execution of the paper, intending to use it merely as a sham justification of her intercourse, and never at the time intending to rely on it to establish a claim of wifehood. Accord-

ing to her own testimony she wanted the paper to show to her family after she had permitted the defendant to remain over night with her in her room. It was thus intended as the first notice to the members of her family, and no satisfactory reason has been given why some members of the family were not called upon to witness the alleged agreement of marriage at the time it was entered into.

I have thus far discussed the said paper on the assumption of its genuineness. But the defendant denies that he executed it, while the plaintiff contends that she was present, and saw the defendant execute it. Upon a cursory reading of the testimony bearing upon this disputed point the plaintiff seems to stand corroborated, and yet upon close examination and analysis there remains a doubt. The testimony of the members of plaintiff's family as to admissions alleged to have been made by the defendant is the testimony of witnesses who, notwithstanding the terrible disclosures of this case, have an interest in upholding the honor of the family, and the circumstances surrounding the making of the alleged admissions do not demand that they should receive the construction contended for° by the plaintiff, even if they were made. The clamor of these members of plaintiff's family, and the clamor on the part of the plaintiff herself, for a ceremonial marriage, in the face of defendant's persistent refusal, portray a consciousness that no marriage at all had ever been contracted. Besides, admissions are always considered as dangerous evidence, because it is so easy to attribute to mere words spoken a meaning different from the one entertained by the speaker. The testimony of the bank teller stands impaired by his admission that in some other cases, in which he had been equally positive in his opinion as to the genuineness of a signature, the signature had turned out to be a forgery. Nor is the opinion of the expert, based solely upon a comparison of handwritings, entitled to any greater weight, for the books contain a large number of cases in which the most positive opinions of such experts turned out to have been erroneous. The so-called "Morey letter," which, according to the positive opinion of such an expert, was written by the late James A. Garfield prior to his election as president of the United States, serves as a conspicuous illustration of what I have stated. Moreover, in the case at bar the paper now under examination, if written by the defendant at all, bears internal evidence that it was not written and executed under the circumstances, and for the purpose, claimed by the plaintiff, for about one inch below the alleged signature of the defendant appears the date, viz. "New York, July 16, 1890," and about one inch below that appears the signature of the plaintiff. The latter seems to have been added subsequently, for a bare inspection shows that it was written with a different ink. It has also been shown, and indeed admitted by the plaintiff, that the plaintiff had practiced to make her writing appear similar to that of the defendant, because the defendant claimed that his hand was more "English." Indeed, a number of exhibits conceded to be in the handwriting of the plaintiff show a wonderful capacity and

skill on the part of the plaintiff to vary her writing. Taking everything together, therefore, inclusive of probabilities and the motive the plaintiff had for possessing some evidence, there remains a fair doubt as to whether the defendant did execute the said certificate. But, after all, it is not necessary to determine the point specifically and absolutely. For all practical purposes it is sufficient to hold that, even if the defendant be assumed to have executed the said paper, it was executed, as hereinbefore stated, not as an evidence of a marriage duly entered into, but as a cover to enable the plaintiff to hide her illicit intercourse. Many of the reasons which create doubt as to the genuineness of the alleged certificate of marriage apply with equal force to the few out of many letters written by the defendant to the plaintiff, in which the plaintiff is called "wife" in endearing terms. Moreover, words of endearment contained in love letters are never to be taken literally. The extravagant use of such words, therefore, cannot be held to conclude the defendant to their literal meaning, even if he did write them. If that were so, the plaintiff, with equal propriety, might be held to be absolutely concluded by the use of her maiden name in indorsing defendant's checks. In a case of this kind the court is bound to look below the surface of appearances.

There are many other facts and circumstances of minor importance in the case. They have not been overlooked, but it is not practicable, and it would serve no useful purpose, to discuss them in detail. Suffice it to say that there is none which calls for a modification of anything I have said. Upon the whole case, after due consideration of all the details of it, inclusive of the probabilities, and after having seen the parties and their witnesses upon the stand, and observed the manner in which each gave his or her testimony, I cannot find that the plaintiff has established her case by a fair preponderance of evidence, and consequently the defendant is entitled to judgment dismissing the complaint, with costs. The attorneys for the defendant are directed to prepare and submit findings in accordance with the views expressed by me.

In this connection I feel it to be my duty to say a few words concerning the requests made by plaintiff's attorneys for findings. Although the whole case turns upon a single question, viz. marriage or no marriage, plaintiff's attorneys have submitted requests for 283 separate findings of fact and 6 requests for conclusions of law. The labor of passing upon these requests with due care, and recording my ruling in each instance, and attesting the same with my initials, will consume several days' time. Most of the requests are for findings upon isolated pieces of evidence. This practice has been repeatedly condemned by the courts, and especially by the general term of this court in Livingston v. Railway Co., (Super. N. Y.) 17 N. Y. Supp. 486, and in Schnugg v. Railroad Co., (Super. N. Y.) 26 N. Y. Supp. 798, and by the court of appeals in Steubing v. Railroad Co., 138 N. Y. 658, 34 N. E. 369. Such detailed findings are wholly unnecessary for the proper protection of the rights of a client. It is only the necessary general or ultimate facts constituting the foundation of the decision which must be found, and

a refusal to find a minor fact which, if found, does not, while standing by itself, call for a change or modification of the general or ultimate facts already found, or for a change or modification of some conclusion of law based upon such general and ultimate facts, is wholly immaterial, and does not constitute error.  No trial judge should, therefore, be asked to waste valuable time in passing upon unnecessary requests.  The practice of doing so has lately, however, assumed such alarming proportions, and has become such a great abuse, that the legislature should take cognizance of it and provide a remedy.  If this is not done, the present judicial force available for trying equity cases will shortly become wholly inadequate for the dispatch of this class of cases, and the delay in having a cause reached, which already is great, must necessarily become greater and greater.  In order to do my share towards saving as much time as possible, I direct that the attorneys for the defendant examine, in the light of the opinion rendered by me, and in connection with the findings to be prepared and submitted by them, as already directed, the requests made by plaintiff's attorneys, and submit a memorandum stating which of said requests should be granted and which should be refused.  After the receipt of such memorandum and findings, I shall make a final disposition of the requests, and settle the form of my decision.